IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

FILED
LOGGED
ENTERED
RECEIVED

JAN 17 2024

CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY_____DEPUTY

| | | |
|---|---|---|
| ALBERT CURTIS MILLS, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No.: 22-cv-1512-LKG |
| | ) | |
| v. | ) | Dated: January 12, 2024 |
| | ) | |
| FRANK BISHOP, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| ALBERT CURTIS MILLS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.:  22-cv-2805-LKG |
| | ) | |
| LAUREN BEITZEL, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| ALBERT CURTIS MILLS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.:  23-cv-0382-LKG |
| | ) | |
| APRIL CARR, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| ALBERT CURTIS MILLS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.:  23-1027-LKG |
| | ) | |
| LAUREN A. BEITZEL, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM OPINION**

Self-represented plaintiff Albert Curtis Mills, a prisoner at the North Branch Correctional

Institution ("NBCI"), filed the above referenced Complaints which all arise from the decision of

his mental health care team, in June of 2019, to end his single cell housing status and place him in

a double cell. Because the Complaints arise out of this event and assert many of the same

allegations against several of the same Defendants the cases are consolidated for disposition.

In each of the cases motions to dismiss or, alternatively, for summary judgment were filed

on behalf of the named Defendants. Pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir.

1975), in each case, the Court informed Mills of his right to respond to the Motion, and that the

failure to file a response in opposition to the Motion could result in dismissal of his Complaint.

The motions are now ripe for review. No hearing is necessary to resolve the motions. *See* Local

Rule 105.6 (D. Md. 2023). For the reasons that follow, the Motions are granted.

I.     Procedural History

A. 22-cv-1512-LKG (hereinafter Mills I)

On June 21, 2022, Mills filed a "Verified Complaint" (Mills I, ECF No. 1), which he later

supplemented (Mills I, ECF Nos. 5, 6, and 16)[1] alleging that he has a history of mental illness and

---

[1] The Supplemental Complaint docketed at Mills I, ECF No. 16 concerns alleged retaliation in September and October 2019 relating to Mills's housing assignment and medical/mental health treatment and seeks different damages and relief against a different set of Defendants from those named in the initial Complaint. It appears that Mills intended this filing to be docketed as a separate Complaint. The allegations contained in the supplement will therefore not be considered. The Clerk is directed to provide Plaintiff a copy of ECF No. 16, Civil Action No. 22-cv-1512-LKG. If Mills has not already advanced those claims in other cases recently before the Court and he still wishes to pursue those allegations he may refile ECF No. 16 as a new civil rights Complaint.

[2] As discussed elsewhere in this opinion, Mills has filed other complaints regarding his assignment to a double cell. Specifically, Mills's claims regarding his disciplinary segregation confinement for refusing to move to a double cell, including that he was denied due process when his disciplinary hearing was held in absentia and the conditions of his confinement on disciplinary

that the Maryland Division of Correction has a policy and procedure of double celling severely mentally ill inmates which violates his rights. Mills I, ECF No. 1 at 13-15. Mills alleges that he should be granted a permanent single cell. *Id*. at 29-30.[2]  Mills names as Defendants, former Governor Lawrence Hogan, former Secretary of DPSCS Robert Green, former DPSCS Deputy Secretary for Operations O. Wayne Hill, Division of Correction ("DOC") Assistant Commissioner (West) Frank B. Bishop, Jr., Inmate Grievance Office Director F. Todd Taylor, Jr., Warden Jeff Nines, IGO Administrative Officer III Sandra Holmes, and Correctional Officer Lieutenant Vaughn Whiteman of North Branch Correctional Institution ("NBCI").[3]

Counsel filed a motion to dismiss under Fed. R. Civ. P. 12(b)(6) or, alternatively, for summary judgment under Rule 56, on behalf of former Governor Lawrence Hogan, former Secretary of DPSCS Robert Green, former DPSCS Deputy Secretary for Operations O. Wayne Hill, Division of Correction ("DOC") Assistant Commissioner (West) Frank B. Bishop, Jr., Inmate Grievance Office Director F. Todd Taylor, Jr., Warden Jeff Nines, IGO Administrative Officer III Sandra Holmes, and Correctional Officer Lieutenant Vaughn Whiteman of North Branch Correctional Institution ("NBCI"). Mills I, ECF No. 18.

Pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), on March 17, 2023, the Court informed Mills of his right to respond to the Motion, and that the failure to file a response

---

segregation were considered and dismissed by this Court in *Mills v. Farris, et al.*, Civil Action No. TDC-22-1640 (D. Md.) and therefore will not be considered in the context of this case. Additionally, Mills also filed a Complaint addressing a hunger-strike he undertook in the summer of 2019 seeking a single-cell and complaining about his housing assignment and mental health treatment plan during that same timeframe. *See Mills v. Iser, et al.*, ELH-22-1691. That case was also resolved in Defendants' favor.  As such, the allegations raised here which are repetitive to those raised in ELH-22-1691 shall also not be considered.

[3]The Clerk is directed to amend the docket to reflect the full and correct names of Defendants.

in opposition to the Motion could result in dismissal of his Complaint. Mills I, ECF No. 19. Mills's requests for discovery (Mills I, ECF Nos. 20, 22) were denied (Mills I, ECF No. 23) and he was twice granted additional time (Mills I, ECF Nos. 23, 25), to and including January 2, 2024, to file any opposition to the dispositive motion.  Mills filed an opposition response on January 4, 2024. Mills I, ECF No. 26. Defendants replied. Mills I, ECF No. 27.

B.  22-cv-2805-LKG (hereinafter Mills II)

On October 31, 2022, Mills filed a  "Verified Complaint" (Mills II, ECF No. 1) alleging that he has a history of mental illness and had an order to be single celled which was rescinded resulting in his being placed on disciplinary segregation which worsened his mental health.  *Id*. at 13-15. Mills alleges that he should be granted a permanent single cell. *Id*. at 29-30.  Mills names as Defendants, Lauren Beitzel, Vaughn Whiteman, John G. Sindy, Misty J. Guthrie, Richard S. Roderick. Lawri Winters, James Wilson, Anita Rozas, Frank B. Bishop, Jamie Farris, Christopher Wedlock, F. Todd Taylor, Robin Woolford, Robert L. Green, Lawrence J. Hogan, and the Division of Correction.[4]

Counsel filed a motion to dismiss pursuant to 28 U.S.C. § 1915, Fed. R. Civ. P. 41(b), 12(b)(6), and 12(f) on behalf of Defendants Lauren Beitzel, Vaughn Whiteman, John G. Sindy, Misty J. Guthrie, Richard S. Roderick, Lawri Winters, James Wilson, Anita Rozas, Frank B. Bishop, Jamie Farris, Christopher Wedlock, F. Todd Taylor, Robin Woolford, Robert L. Green, Lawrence J. Hogan, the Maryland Department of Public Safety and Correctional Services Division of Correction, and the North Branch Correctional Institution. Mills II, ECF No. 11. Defendants also incorporate their dispositive motion filed in Civil Action No. 23-cv-382-LKG. *See* Mills II, ECF No. 11 at 6-10 (referencing the exhibits attached to ECF 9, Civil Action No. 23-cv-382-LKG).

---

[4] The Clerk is directed to amend the docket to reflect the full and correct names of Defendants.

Pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), on June 28, 2023, the Court informed Mills of his right to respond to the Motion, and that the failure to file a response in opposition to the Motion could result in dismissal of his Complaint.  Mills II, ECF No. 12. Mills sought and was granted an extension of time to and including August 28, 2023 to file any opposition to the dispositive motion. Mills II, ECF Nos. 13 and 14. However, to date, Mills has not filed an opposition response in this case.

C. 23-0382-LKG (hereinafter Mills III)

On February 9, 2023, Mills filed  a "Verified Complaint" (Mills III, ECF No. 1) alleging that he has a history of mental illness and that in October of 2019 he was denied adequate shelter and psychiatric care. Mills III, ECF No. 1 at 5. He also contends that the refusal to provide him a single cell has resulted in his prolonged incarceration on disciplinary segregation. *Id.* Mills names as Defendants, April Carr, Lauren A. Beitzel, Vaughn Whiteman, John G. Sindy, Misty J. Gutherie, Richard S. Roderick. L. Winters, J. Wilson,  Jeff Nines, A. Rozas, NBCI, Frank B. Bishop and Robin Woolford.

Counsel filed a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), or, in the alternative for summary judgment on behalf of Defendants North Branch Correctional Institution ("NBCI"), April Carr, Lauren Beitzel, Vaughn Whiteman, John G. Sindy, Misty J. Guthrie, Richard S. Roderick, Lawri Winters, James Wilson, Jeff Nines, Anita Rozas, Frank B. Bishop, and Robin Woolford. Mills III, ECF No. 9 and supplemented at ECF No. 16. Defendants also incorporate their dispositive motion filed in Mills I, Civil Action No. 22-cv-1512-LKG. *See* ECF No. 9-1 at 4.

Pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), on June 6, 2023, the Court informed Mills of his right to respond to the Motion, and that the failure to file a response in opposition to the Motion could result in dismissal of his Complaint. Mills III, ECF No. 10. Mills filed an opposition response. *Id.*, ECF No. 11. Thereafter, Defendants filed a reply and supplemental reply. *Id.*, ECF Nos. 12, 15.

D. 23-cv-1027 (hereinafter Mills IV)

On April 14, 2023, Mills filed a "Verified Complaint" (Mills IV, ECF No. 1), again alleging that he has a history of mental illness and that Defendants have failed to provide him shelter, mental health care, and reasonable safety when attempting to move him to a double cell in October of 2019. *Id.* at 8, 10. Mills names as Defendants, Lauren Beitzel, April Carr, Vaughn Whiteman, John G. Sindy, Misty J. Guthrie, Richard S. Roderick, L. Winters, J. Wilson, Anita Rozas, Frank B. Bishop, Jamie Farris, Robin Woolford, North Branch Correctional Institution, the Maryland Department of Public Safety and Correctional Services Division of Correction, and the Inmate Grievance Office.

Counsel filed a motion to dismiss pursuant to 28 U.S.C. § 1915, Fed. R. Civ. P. 41(b), 12(b)(6), and 12(f) on behalf of Defendants Lauren Beitzel, April Carr, Vaughn Whiteman, John G. Sindy, Misty J. Guthrie, Richard S. Roderick, L. Winters, J. Wilson, Anita Rozas, Frank B. Bishop, Jamie Farris, Robin Woolford, North Branch Correctional Institution, the Maryland Department of Public Safety and Correctional Services Division of Correction, and the Inmate Grievance Office. [5] Mills IV, ECF No. 10. Defendants also incorporate the dispositive motion filed in Mills III, Civil Action No. 23-cv-382-LKG. *See* Mills IV, ECF No. 10-1 at 3.

---

[5] The Clerk shall amend the docket to reflect the full and correct names of Defendants.

Pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), on August 11, 2023, the Court informed Mills of his right to respond to the Motion, and that the failure to file a response in opposition to the Motion could result in dismissal of his Complaint. Mills IV, ECF No. 11.  Mills filed an opposition response. *Id*. at ECF No. 12.

## II.  Factual Background

### A.  Mills's Claims

Mills alleges that he has a history of serious mental illness, including schizophrenia, psychotic disorder, Parkinson's disease, and dementia. Mills I, ECF No. 1 at 14-15; Mills II, ECF No. 1 at 13-24; Mills III, ECF No. 1 at 7-8; Mills IV, ECF No. 1 at 9-10.  He states that the Maryland Division of Correction has "an extremely dangerous institutional policy and procedure of double celling severely mentally ill (S.M.I.) inmates." Mills I, ECF No. 1 at 13. He states that "the mental health care is harsh" when it double cells SMI inmates. *Id*. at 14.

Mills explains that he was housed in a single cell in the Special Needs Unit ("SNU") at NBCI from from June 1, 2009, until June 20, 2019, when he was ordered to move to a double-cell and to be housed with another inmate, who is also severely mentally ill. Mills I, ECF No. 1 at 15-18; Mills II, ECF No. 1 at 24-26; Mills III, ECF No. 1 at 10; Mills IV, ECF No. 1 at 10-11.  He claims that Defendants Beitzel, Carr, Whiteman, Sindy and Guthrie attempted to make him move. Mills II, ECF No. 1 at 25; Mills III, ECF No. 1 at 11; Mills IV, ECF No. 1 at 11. He alleges that he was removed from the SNU and ordered to a double cell for his "legal work" and in order to deny him mental health treatment. Mills III, ECF No. 1 at 7.

Mills refused to go into the double cell. Mills I, ECF No. 1 at 20; Mills II, ECF No. 1 at 27. He claims that being in a double cell worsened his mental health conditions. Mills 1, ECF No. 1 at 21-22.

Because of his refusal to be double celled, Mills was placed on disciplinary segregation for 43 days where his symptoms also worsened. Mills I, ECF No. 1 at 23; Mills II, ECF No. 1 at 27. Thereafter, staff again attempted to move Mills to a double cell but he again refused and was again moved to disciplinary segregation. Mills I, ECF No. 1 at 24.

Mills claims that on October 21, 2019, correctional staff removed him from the SNU and put him in a protective custody cell but then tried to move him to a double cell in general population with an inmate who was not mentally ill. Mills III, ECF No. 1 at 12; Mills IV, ECF No. 1 at 11-12. Mills refused to go into the cell and was placed on disciplinary segregation where he remained as of the filing of the Complaint in Mills III. Mills III, ECF No. 12 at 13.[6]  Mills states that Defendants have refused to provide him a single cell in violation of his rights. *Id*. at 13-14. He claims that he has been denied single cell status due to his complaints about the SNU. Mills III, ECF No. 1 at 14. Mills states that his being housed on disciplinary segregation worsened his mental health. Mills IV, ECF No. 1 at 13.

Mills alleges that the Defendants named in Mills II "knew Mills has severe mental illnesses and knew or should have known the effects of these severe mental illnesses on Mills on disciplinary segregation. . . ." Mills II, ECF No. 1 at 31-32.  He alleges that all of the Defendants named in Mills IV had "constructive knowledge of [his] illnesses" and the effect being held on disciplinary segregation had on his health. Mills IV, ECF No. 1 at 16.  Additionally, Mills claims that Beitzel

---

[6] In Mills IV, Mills also references another term of disciplinary segregation that began on December 19, 2019.  Mills IV, ECF No. 1 at 17. He reasserts his claim that confinement on disciplinary segregation violated both his constitutional and statutory rights. *Id*. at 17-22

and her staff refused to provide him a single cell, which, in Mills's, view is required to treat his mental health illnesses. Mills I, ECF No. 1 at 25-26; Mills III, ECF No. 1 at 15-16, 21-22.  Mills claims that he should be granted a permanent "psychological single cell" because housing him with another inmate places him in "grave danger of maim and murder." Mills I, ECF No. 1 at 29-30. He further claims that because he was granted a single cell by Dr. Holwager in 2009 he should always have a single cell and that the directive for single cell housing cannot be removed by Beitzel, who is not a doctor. Mills I, ECF No. 1 at 29. He generally claims that all Defendants knew or should have known that housing him on disciplinary segregation and/or denying him single cell status would exacerbate his mental illness, and the move to a double cell demonstrated deliberate indifference to his needs. Mills II, ECF No. 1 at 36-40. He further claims that the move violated his rights under the Americans with Disabilities Act and Rehabilitation Act because Defendants failed to accommodate his disability. *Id.* at 45-46.

Additionally, Mills claims that Defendant Hill dismissed his appeal and that Defendants Bishop, Taylor, Woolford, Holmes, Todd, Green, and Hogan dismissed his grievance. Mills I, ECF No. 1 at 37; Mills II, ECF No. 1 at 33.

Mills states that Defendants Hill, Todd, Holmes, Green, and Hogan created a policy or custom of "systematic deficiencies in staffing and procedures which make unnecessary suffering inevitable for mental health care supports. . . ." Mills I, ECF No. 1 at 42.  He also states, "Defendants created a policy or custom under which unconstitutional practices of denial and segregation and exacerbation and depression and deprivation occurred, or allowed the continuance of such a policy or custom on the Plaintiff." Mills II, ECF No. 1 at 60-61; *see also* Mills IV, ECF No. 1 at 30-31 ("Defendants created a policy or custom of the denial of the psychological single cell to the Plaintiff.").

Additionally, Mills claims that Defendants Bishop and Green were negligent in supervising their subordinates. Mills II, ECF No. 1 at 62. Mills further alleges, generally, that there are not enough mental health providers at NBCI. Mills III, ECF No. 1 at 23.

In his supplemental filings, Mills reiterates his claims and explains that due to the order for him to be double celled he has refused housing, and those refusals resulted in disciplinary proceedings. Mills I, ECF No. 5, 6. He also reiterates his claim that "the policy of double celling special needs unit and severely mentally ill inmates is that this is a dangerous policy that results in anguish and injury to severe injury to death of prison officials and/or inmates. . . ." Mills I, ECF No. 5 at 5. Mills states that while he does not want to be housed on the SNU he wants a "permanent psychological single cell." Mills I, ECF No. 5 at 6. He alleges that being forced to double cell violates his rights. *Id*. at 10.

Mills seeks compensatory and punitive damages as well as injunctive relief. Mills I, ECF No. 1 at 43-48; Mills II, ECF No. 1 at 64-68; Mills III, ECF No. 1 at 37-39; Mills IV, ECF No. 1 at 40-44.

In his opposition responses, Mills reiterates that he has been housed in a single cell and claims that his move to a double cell was for security purposes rather than medical purposes. Mills I, ECF No. 26. He reiterates his claim that being housed on disciplinary segregation and being denied a single cell exacerbated his mental health symptoms and violates his constitutional and statutory rights. Mills III, ECF No. 18 at 4-5, 23-25. In support of his claims he string cites numerous cases regarding: overcrowding of cells (Mills I, ECF No. 26 at 4-10); deliberate indifference to a psychiatric need (Mills I, ECF No. 26 at 10-17, 21-23, 26-30; Mills III, ECF No. 18 at 5-11); failure to accommodate a disability/exclusion from services under the Americans with Disabilities Act (Mills I, ECF No. 26 at 39-49, 59-76; Mills III, ECF No. 18 at 3); atypical and

significant hardship (Mills III, ECF No. 18 at 2); and use of segregation confinement (Mills III, ECF No. 18 at 13-16).

B.      Defendants' Response

On June 20, 2019, pursuant to orders from Mills' mental health treatment team, Mills was scheduled to be transferred to a new cell.  Mills I, ECF No. 18-3 at 4; ECF No. 18-10, ¶ 2. Mills, however, refused orders to be handcuffed for the move. As a result, Mills was issued a Notice of Inmate Rule Violation ("NOIRV") and placed on Administrative Segregation Pending Adjustment (ASPA). *Id.*, ECF No. 18-3 at 4.  Mills refused to sign the receipt for service of the ticket. *Id.* at 6. The Adjustment Hearing was held on July 2, 2019: Mills did not deny that he refused orders to be handcuffed. Rather, he stated that he had told the officer who came to move him that "under no circumstances would [he] be double celled." *Id.* at 8. Hearing Officer Farris found Mills guilty of refusing to obey an order and sanctioned him to 15 days of disciplinary segregation, which ran from June 20 to July 4, 2019. *Id.*, at 9-10. No good conduct credits were revoked. *Id.* at 10.

On July 4, 2019, Mills was scheduled to come off of segregation and return to general population. Mills I, ECF No. 18-3 at 14; ECF No. 18-4, ¶ 5.  Officer Gilpin approached Mills's cell for the move but Mills again refused to be handcuffed so that he could be escorted for the cell change.  *Id*. Gilpin issued Mills a NOIRV for disobeying the order. Mills I, ECF No. 18-3 at 14; ECF No. 18-4, ¶ 6. A formal hearing was recommended Mills was held on ASPA pending the hearing. Mills I, ECF No. 18-3 at 14. Mills again refused to sign for receipt of the NOIRV. *Id.* at 15; ECF No. 18-5, ¶ 5.

On July 11, 2019, COII Jason Frantz was assigned to escort inmates to the hearing room for disciplinary Adjustment Hearings. Mills I, ECF No. 18-6, ¶ 4. Mills advised Frantz that he did not want to attend the hearing but refused to sign the waiver of appearance form. *Id.,* ¶ 5. Frantz

completed the Inmate Waiver of Appearance form, indicating Mills's refusal. Mills I, ECF No. 18-6, ¶ 6; ECF No. 18-3 at 17.   Frantz advised Gilpin, who was the institutional representative attending adjustment hearings on that day, of Mills' refusal. Mills I, ECF No. 18-6, ¶ 7; ECF No. 18-7, ¶ 5.

Hearing Officer Farris conducted the Adjustment Hearing in absentia and, based upon the sworn statement contained in the NOIRV and the fact that Mills remained in the same cell, found Mills guilty of the rule violation and sanctioned him to 30 days of disciplinary segregation. Mills I, ECF No. 18-3 at 19-21.   Mills's appeal of his disciplinary conviction was affirmed by the Warden. *Id*. at 24. The Chief Hearing Officer Kimberly Stewart of the Office of the Commissioner of the Division of Correction, however reversed Mills's conviction and vacated his disciplinary segregation sanction, holding that "the record [was] insufficient to support a finding that inmate Mills voluntarily waived his right to appear at his disciplinary hearing," because the waiver of appearance form was not signed by the escort officer and the officer did not testify under oath at the hearing regarding his interaction with Mills. *Id*. at 28.[7]

Contemporaneous with his segregation confinement Mills engaged in a hunger strike and self-declared religious fast from June 29 to July 25, 2019—demanding placement in a single cell.[8] As a result of his hunger strike, Mills was transferred from NBCI to the WCI prison hospital, where he was housed from July 18 to 25, 2019. Mills I, ECF No. 18-3 at 34. Upon ending his hunger

---

[7]Mills filed a § 1983 complaint in this Court regarding his refusal of housing and the subsequent disciplinary proceedings arising from the June and July 2019 incidents: *Mills v. Farris, et al.*, TDC-22-1640. The case was dismissed upon Motion of Defendants. To the extent Mills raises those claims again in these proceedings they will not be reconsidered.

[8] This hunger strike was the subject of another § 1983 complaint filed by Mills. *Mills v. Iser, et al.*, ELH-22-1691, at ECF 1-2 (corrected Complaint)(the case was dismissed in part and judgment entered in favor of Defendants); *see also* Mills I, ECF 18-3 at 35 (Hunger Strike Log).

strike, Mills returned to a disciplinary segregation cell at NBCI on July 25, 2019 (*id*. at 34), before returning to general population on August 2, 2019. *Id.* at 36.

Mills's adjustment history confirms that Mills regularly refused orders by correctional staff which resulted in the issuance of NOIRVs, a hearing before a hearing officer, findings of guilt, and ultimately Mills being sanctioned to a term of confinement on disciplinary segregation. Mills III, ECF No. 19-2.  At the end of each of his disciplinary segregation terms, he has been directed by correctional staff to present himself for handcuffing so that he can be escorted to a new cell but Mills refused to comply with the orders and the cycle repeats. *See e.g. id*., ECF No.  9-3 at 41-62.

Mills has been assigned to a single cell since July 13, 2021 despite the recommendation of his mental health providers that he be double celled. Mills III, ECF No. 9-3 at 66.

As to Mills's assignment to SNU and/or a double cell, Defendants explain that medical, psychological, and psychiatric care are available to all NBCI inmates not just inmates confined in the SNU. Mills I, ECF No. 18-11, ¶ 5. The decision to move Mills to a double cell on the SNU in June of 2019 was made by Mills's mental health team "with the goal of continuing to treat and improve his health and well-being by addressing socialization, ultimately moving him towards a return to general population." *Id*., ¶ 6.

Lauren Beitzel, LCSW, avers that as the Acting Supervisor, Acting SNU Coordinator, and member of the Multi-Disciplinary Team, she submitted the recommendation that Mills be double celled to the appropriate NBCI staff. *Id*. Sometime after Mills refused his double cell housing assignment an unidentified medical provider recommended Mills be placed in a single cell in the SNU. *Id*., ¶ 7. Beitzel explains that this conflicted with the recommendation of the SNU treatment team who maintain their recommendation that Mills be double celled. *Id*. Beitzel further notes that Mills has expressed his desire not to return to the SNU. *Id*.

Mills's pertinent mental health records reveal that on June 22, 2019, he was seen by psychiatrist, Dr. Vincent Siracusano for medication management.  Dr. Siracusano noted that Mills had recently been transferred from housing unit one to housing unit two because he refused a cell change. Mills I, ECF No. 18-9 at 122. Misty Guthrie, LGSW, met with Mills on July 9, 2019 for counselling. *Id*. at 149.  She reported that Mills complained that staff, who were no longer employed at the facility, told him he would aways be single celled. *Id*. He reported his belief that God would provide him a single cell and that the last time he had seen Dr. Siracusano, Siracusano told him he should be in a single cell. *Id*. Guthrie noted that Mills would be provided follow up as needed. *Id*. Notably, at neither encounter did Mills's mental health care providers write any orders for single cell status.

On August 7, 2019, Beitzel updated Mills's chart after he had seen Dr. Siracusano, for medication management which Beitzel also attended. Mills I, ECF No. 18-9 at 223-24. Mills advised Dr. Siracusano that he had stopped taking his psychiatric medication and had been on a "religious fast" in order to obtain a single cell. Mills had returned to the SNU in a single cell and had discontinued his fast and was at that time compliant with his medication.  Mills's "intentions presented as well thought out and void of interference from severe mental illness." *Id*.  It was noted that he would continue to be followed by the psychiatry department. *Id*.  The following week, Mills again saw Guthrie for counselling. *Id*. at 237.  Mills was described as agitated and demanding and blamed staff for not following the orders to have him single celled that had been entered by previous clinicians who were no longer employed at the facility.  *Id.*

Beitzel entered a late entry in Mills's chart on October 24, 2019, indicating that Mills had been seen on October 9, 2019 and at that time was advised of his removal from the SNU program. *Id.* at 238.  He was read his discharge paper work which stated:

It has become evident that Mills does not require the therapeutic milieu of the SNU. Even when not compliant with psychiatric medications (6/23/19-7/28/29), Mills functioning, ability to reason, attention to ADLs, and presentation are without signs of a severe mental illness.  His ability to be a detailed historian and formulate and stick to well thought plans are not indicative of someone with impaired functioning due to severe mental illness. He is hyperreligious, but does not present as delusional or paranoid. He has continued to be rude, oppositional, argumentative, demanding, entitled, and disrespectful to SNU staff and inmates, particularly in regard to housing and attempts to dictate his treatment. He blames others and takes no personal responsibility. His focus is often on others and their wrongdoings. There is documentation that he has been verbally abusive and antagonized vulnerable SNU inmates. Mills attended a few groups at the start of the SNU MHM program. Currently he does not participate in any of the groups. On 5/29/19, Mills signed an ROR stating that he did not want to participate in any of the groups offered. The team feels that he no longer requires placement on the SNU tier.

*Id*.

On October 24, 2019, Mills refused to attend his medication management appointment with Dr. Siracusano. *Id*. at 240. Mills signed a release of responsibility and Dr. Siracusano noted that Mills was not compliant with his medications and would be scheduled for another appointment in December. *Id*.

Mills again refused to attend a mental health appointment on October 29, 2019, and also refused to sign a release of responsibility. Mills I, ECF No. 18-8 at 239.  The appointment was prompted by Mills's complaints that he was doing worse on disciplinary segregation. It was also noted that since he had been advised of his removal from the SNU, he stopped taking his psychiatric medications. *Id*. Beitzel noted that Mills was scheduled to remain on disciplinary segregation until December 19, 2019 for refusing housing. *Id*.

On August 12, 2021, Beitzel entered a chart update indicating that Mills had refused his monthly mental health counselling session and refused to sign a release of responsibility.  *Id*. at 254.  Beitzel noted that Mills had routinely refused his psychology and psychiatry appointments and when he was seen he was demanding and fixated on gaining a single cell for life. *Id*.  She

noted that Mills had been without psychiatric medication since October of 2019, without evidence of severe mental illness since that date. She noted that his chart would be updated to reflect resolution of his severe mental illness, but he would continue to be seen by psychology as needed. *Id.* Mills's treatment team continues to recommend that Mills be double-celled. Mills I, ECF No. 18-11, at ¶ 7.

Beitzel avers that she has never used verbal abuse, threats, or intimidation against Mills and is not aware of any other mental health or DPSCS employee doing so. Mills I, ECF No. 18-11, ¶ 8. She further avers that she never retaliated against Mills for his requesting a single cell, or for any request he made, and is not aware of any other staff retaliating against Mills. *Id.*

Defendants provide copies of the policies and procedures regarding disciplinary segregation (Mills I, ECF No. 18-3 at 38-52), the Segregation Orientation and Information Manual provided to inmates (*id.*, at 52-56), the Staff Alert Procedures Manual (*id.* at 57-59), the list of items authorized for disciplinary segregation inmates (*id.* at 60), the forms for placing an inmate on and off staff alert (*id.* at 62-63), and the Clinical Services & Inmate Health Operations Manuals (*id.* at 64-151).

## II.     Standards of Review

Mills is self-represented. Therefore, his submissions are liberally construed. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); see Fed. R. Civ. P. 8(f) ("All pleadings shall be so construed as to do substantial justice"); *see also Haines v. Kerner*, 404 U.S. 519, 520 (1972) (stating that claims of self-represented litigants are held "to less stringent standards than formal pleadings drafted by lawyers"); *accord Bala v. Cmm'w of Va. Dep't of Conservation & Recreation*, 532 F. App'x 332, 334 (4th Cir. 2013). But, the court must also abide by the "'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Bouchat v.*

*Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)), *cert. denied*, 541 U.S. 1042 (2004).

   A.   Motion to Dismiss

   Defendants' Motions are styled as a motion to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56. A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Vol. Fire Dept., Inc. v. Montgomery County*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011).

   Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways, Inc.,* 510 F.3d 442, 450 (4th Cir. 2007). Under Rule 12(b)(6), however, a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d). If the court does so, "the motion must be treated as one for summary judgment under Rule 56," but "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d); *see Adams Housing, LLC v. The City of Salisbury, Maryland,* 672 F. App'x 220, 222 (4th Cir. 2016) (per curiam).

   A court may not convert a motion to dismiss to one for summary judgment sua sponte, unless it gives notice to the parties that it will do so. *See Laughlin v. Metro Washington Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998) (stating that a district court "clearly has an obligation to notify parties regarding any court-instituted changes" in the posture of a motion, including conversion under Rule 12(d)); *Finley Lines Joint Protective Bd. Unit 200 v. Norfolk So. Corp.,* 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous

materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials."); *see also Adams Housing, LLC*, 672 F. App'x at 622 ("The court must give notice to ensure that the party is aware that it must 'come forward with all of [its] evidence.'") (citation omitted).  However, when the movant expressly captions its motion "in the alternative" as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin,* 149 F.3d at 261.

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it."  5 C WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1366, at 159 (3d ed. 2004, 2011 Supp.). But, this discretion "should be exercised with great caution and attention to the parties' procedural rights." *Id.* at 149.  In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary.  *Id.* at 165-67.

Summary judgment is generally inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont De Nemours and Co. v. Kolon Industries, Inc.*, 637 F.3d 435, 448-49 (4th Cir. 2012); *see Shaw v. Foreman*, 59 F.4th 121, 128 (4th Cir. 2023) (4th Cir. 2023); *Putney v. Likin*, 656 F. App'x 632, 638-39 (4th Cir. 2016) (per curiam); *McCray v. Maryland Dep't of Transportation*, 741 F.3d 480, 483 (4th Cir. 2015).  However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more

time was needed for discovery.'"  *Harrods Ltd. V. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)).

To raise adequately the issue that discovery is needed, the nonmovant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery.    Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)).  "[T]o justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'"  *Scott v. Nuvell Fin. Servs., LLC,* 789 F. Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted), *rev'd on other grounds sub nom. Gardner v. Ally Fin., Inc.*, 514 F. App'x 378 (4th Cir. 2013) (per curiam).  A nonmoving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment."  *Strag v. Bd. Of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see McClure v. Ports*, 914 F.3d 866, 874-75 (4th Cir. 2019); *Gordon v. CIGNA Corp.*, 890 F.3d 463, 479 (4th Cir. 2018); *Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x. 274 (4th Cir.), *cert. denied*, 555 U.S. 885 (2008).

If a nonmoving party believes that further discovery is necessary before consideration of summary judgment, the party who fails to file a Rule 56(d) affidavit does so at his peril, because "'the failure to file an affidavit . . . is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.'"  *Harrods*, 302 F.3d at 244 (citations omitted).  But, the nonmoving party's failure to file a Rule 56(d) affidavit cannot obligate a court to issue a summary judgment

ruling that is obviously premature.  And, a court "should hesitate before denying a Rule 56(d) motion when the nonmovant seeks necessary information possessed only by the movant." *Pisano v. Strach*, 743 F.3d 927, 931 (4th Cir. 2014).

The Fourth Circuit has placed "'great weight'" on the Rule 56(d) affidavit, and has said that a mere "'reference to Rule 56(f) [now Rule 56(d)] and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for [an] affidavit.'" *Harrods*, 302 F.3d at 244 (internal citation omitted).  Nevertheless, the Court has "not always insisted" on a Rule 56(d) affidavit.  *Id.*  Failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary" and the "nonmoving party's objections before the district court 'served as the functional equivalent of an affidavit.'"  *Id.* at 244-45 (internal citations omitted); *see also Putney*, 656 F. App'x at 638; *Nader v. Blair*, 549 F.3d 953, 961 (4th Cir. 2008).  "This is especially true where, as here, the non-moving party is proceeding pro se."  *Putney*, 656 F. App'x at 638.

On the other hand, "[a] party may not simply assert in its brief that discovery was necessary and thereby overturn summary judgment when it failed to comply with the requirement of [Rule 56(d)] to set out reasons for the need for discovery in an affidavit."  *Nguyen v. CNA Corp.*, 44 F.3d 234, 242 (4th Cir. 1995) (citing *Hayes v. N. State L. Enf't Officers Ass'n*, 10 F.3d 207, 215 (4th Cir. 1993)); *see also Rohrbough v. Wyeth Labs., Inc.*, 916 F.2d 970, 972 n.3 (4th Cir. 1990) ("[I]f plaintiffs genuinely were concerned that defendant's motion was premature, plaintiffs should have sought relief under Fed. R. Civ. P. 56[(d)].").

As the Fourth Circuit has said, when a district judge rules on a summary judgment motion prior to discovery, it is akin to "for[cing] the non-moving party into a fencing match without a

sword or mask." *McCray*, 741 F.3d at 483; *accord Putney*, 656 F. App'x at 639.  And, the Fourth

Circuit recently reaffirmed this principle when it concluded that a district court abused its

discretion by granting summary judgment before discovery, even though the plaintiff failed to

comply with Rule 56(d), because "the district court was on fair notice of potential disputes as to

the sufficiency of the summary judgment record." *Shaw*, 59 F.4th at 129.  In *Shaw*, much of the

evidence the plaintiff needed involved the subjective knowledge of the prison officials or was in

their exclusive control.  *Id.*; *see also Pledger v. Lynch*, 5 F.4th 511, 526 (4th Cir. 2021).

Here, Mills requested discovery, which was previously denied. Mills I, ECF No. 23; Mills

III, ECF No. 17.  In particular, Mills sought his entire medical and psychiatric file as well as the

policies of YesCare, the medical provider at NBCI.  In denying the discovery request, the Court

noted that defendants provided a large portion of his medical record and Mills had failed to explain

how the requested material was necessary for him to respond to the dispositive motions. Mills I,

ECF No. 23 at 3; Mills III, ECF No. 17 at 3.  Further, Mills was present during the incidents at

issue and what took place is within his personal knowledge.  Indeed, testimony based on personal

knowledge or firsthand experience can constitute evidence of disputed material facts, even if it is

uncorroborated and self-serving.  *Lovett v. Cracker Barrel Old Country Store, Inc.*, 700 Fed. App'x

209, 212 (4th Cir. 2017).

Accordingly, it is appropriate to address the Motions in part as motions for summary

judgment, as this will facilitate resolution of this case.

B.  Summary Judgment

Summary judgment is governed by Fed. R. Civ. P. 56(a).  It provides, in part: "The court

shall grant summary judgment if the movant shows that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law."  *See Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 322-24 (1986); *see also Cybernet, LLC v. David*, 954 F.3d 162, 168 (4th Cir. 2020); *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018); *Iraq Middle Mkt. Dev. Found v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017).  To avoid summary judgment, the nonmoving party must demonstrate that there is a genuine dispute of material fact so as to preclude the award of summary judgment as a matter of law. *Ricci v. DeStefano*, 557 U.S. 557, 585-86 (2009); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986); *see also Gordon v. CIGNA Corp.*, 890 F.3d 463, 470 (4th Cir. 2018).

The Supreme Court has clarified that not every factual dispute will defeat a summary judgment motion.  "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248; *see Tom v. Hospitality Ventures, LLC*, 980 F.3d 1027, 1037 (4th Cir. 2020).  There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see CTB, Inc. v. Hog Slat, Inc.*, 954 F.3d 647, 658 (4th Cir. 2020); *Variety Stores, Inc.*, 888 F.3d at 659; *Sharif v. United Airlines, Inc.*, 841 F.3d 199, 2014 (4th Cir. 2016); *Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat*, 346 F.3d at 522 (quoting former Fed. R. Civ. P. 56(e)).  Moreover, the nonmovant "must rely on more than conclusory allegations, mere

speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 540 (4th Cir. 2015) (internal quotation marks omitted).

The court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witnesses' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002); *see Hannah P. v. Coats*, 916 F.3d 327, 336 (4th Cir. 2019); *Roland v. United States Citizenship & Immigration Servs.*, 850 F.3d 625, 628 (4th Cir. 2017); *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013). Notably, the district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *accord Guessous v. Fairview Prop. Inv., LLC*, 828 F.3d 208, 216 (4th Cir. 2016).

Thus, the trial court may not make credibility determinations on summary judgment. *Kellen v. Lott*, No. 21-6928, 2022 WL 2093849, at *1 (4th Cir. June 10, 2022) (per curiam); *Betton v. Belue*, 942 F.3d 184, 190 (4th Cir. 2019); *Wilson v. Prince George's County*, 893 F.3d 213, 218-19 (4th Cir. 2018); *Jacobs v. N.C. Administrative Office of the Courts,* 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French,* 499 F.3d 345, 352 (4th Cir. 2007); *Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis*, 290 F.3d at 644-45. Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment is generally not appropriate, because it is the function of the factfinder to resolve factual disputes, including matters of witness credibility.

That said, "conclusory allegations or denials, without more, are insufficient to preclude" the award of summary judgment. *Wai Man Tom*, 980    F.3d   at   1037   (citation   omitted).

Moreover, "a party's 'self-serving opinion . . . cannot, absent objective corroboration, defeat summary judgment.'" *CTB, Inc.*, 954 F.3d at 658-59 (quoting *Williams v. Giant Food Inc.*, 370 F.3d 423, 433 (4th Cir. 2004)). And, "[u]nsupported speculation is not sufficient to defeat a summary judgment motion." *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987); *see also, e.g.*, *Reddy v. Buttar*, 38 F.4th 393, 403-04 (4th Cir. 2022); *CTB, Inc.*, 954 F.3d at 659; *Harris v. Home Sales Co.*, 499 Fed. App'x 285, 294 (4th Cir. 2012). The Court may rely only on facts supported in the record, not simply assertions in the pleadings. 818 F.2d at 1128.

Notably, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). But, if testimony is based on personal knowledge or firsthand experience, it can constitute evidence of disputed material facts, even if it is uncorroborated and self-serving. *Lovett v. Cracker Barrel Old Country Store, Inc.*, 700 Fed. App'x 209, 212 (4th Cir. 2017). Indeed, "'a great deal of perfectly admissible testimony fits'" the "'description'" of "'self-serving.'" *Cowgill v. First Data Technologies, Inc.*, 41 F4th 370, 383 n.8 (4th Cir. 2022) (citing *United States v. Skelena*, 692 F.3d 725, 733 (7th Cir. 2012)).

In sum, to defeat summary judgment, conflicting evidence, if any, must give rise to a genuine dispute of material fact. *See Anderson*, 477 U.S. at 247-48. If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," then a dispute of material fact precludes summary judgment. *Id.* at 248; *see Judd*, 718 F.3d at 313. On the other hand, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

III.    Discussion

Mills alleges that his rights under the Americans with Disabilities Act ("ADA") and the

Rehabilitation Act ("RA"), and the First, Eighth, and Fourteenth Amendments were violated.

Defendants advance a host of contentions. In Mills I and III, they argue that they are

immune from suit for claims asserted against them in their official capacity; they are entitled to

qualified immunity; Mills is not entitled to a single cell; Mills has failed to state a claim against

any of the named Defendants; Mills has failed to state a claim--under the ADA/RA, for failure to

protect, for inadequate medical or mental health care, and for retaliation; and he is not entitled to

injunctive relief.  Mills I, ECF No. 18-1; Mills III, ECF No. 9-1. In Mills II and IV, Defendants

argue[9] that they are immune from suit for claims asserted against them in their official capacity

and Mills has failed to state a claim.  Mills II, ECF No. 11-1; Mills IV, ECF No. 10-1.

A.     ADA/RA

Mills alleges that Defendants' conduct toward him violated the Americans with Disabilities

Act and the Rehabilitation Act which are generally construed to impose the same requirements

---

[9] Defendants' motions include Motions to Dismiss under 28 U.S.C. § 1915, Fed. R. Civ. P. 41 and
to strike under Fed. R. Civ. P. 12. See e.g. Mills II, ECF No. 11; Mills III, ECF Nos. 9, 16; Mills
IV, ECF No. 10. Mills opposes the Motion (Mills III, ECF No. 18 at 27-29) and explains that his
claims were not made for "vengeance" but to seek legal redress, the cases do not contain exactly
the same allegations and do not repeat the exact same allegations.  He states the multiple cases
were not filed maliciously and his reference to other cases was simply to add the factual
background as supplemental information and notes that counsel has referenced other cases filed
by him in their motions, much as he intended to do. As noted above while the cases arise out of
the decision to place Mills in a double cell and the complaints assert a variety of theories against
a number of Defendants and also focus on different time periods. Given Mills's mental health
issues, his pro se status, and exercising the Court's discretion, the Motions to Dismiss under 28
U.S.C. § 1915, Fed. R. Civ. P. 41 and to strike the complaint under Fed. R. Civ. P. 12 (contained
in Mills II, ECF No. 11; Mills III, ECF Nos. 9, 16; Mills IV, ECF No. 10) are denied. The Court
appreciates Defendants' efforts to aid judicial economy, and the summarization of Mills's
litigation history. It appears that given the resolution of some cases recently filed by Mills, he may
be subject in the future to the filing restrictions of 28 U.S.C. § 1915(g). See e.g. Civil Action Nos.
SAG-22-3304 and TDC-22-1640 each dismissing Mills's complaints for failure to state a claim.

due to the similarity of their language.  *Baird ex rel. Baird v. Rose*, 192 F.3d 462, 468 (4th Cir. 1999).

The ADA was enacted in 1990 "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities," 42 U.S.C. § 12101(b)(1), and "to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities."  *Id.* § 12101(b)(2).  The ADA contains five titles:  Title I, Employment; Title II, Public Services; Title III, Public Accommodations; Title IV, Telecommunications; and Title V, Miscellaneous Provisions.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  It prohibits public entities, including "any State or local government" and "any department, agency, special purpose district, or other instrumentality of a State or States or local government," *id.* § 12131(1), from discriminating "by reason of" disability against a "qualified individual with a disability."  *Id.* § 12132.

Title II of the ADA applies to "'anything a public entity does.'"  *Seremeth v. Bd. of County Comm'rs of Frederick County*, 673 F.3d 333, 338 (4th Cir. 2012) (citing cases) (citations omitted); *see also Paulone v. City of Frederick*, 787 F. Supp. 2d 360, 380-81 (D. Md. 2011).  Of import here, Title II applies to state prisons.  *See Penn. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998) ("State prisons fall squarely within the statutory definition of 'public entity . . .'").

For purposes of Title II, a "qualified individual with a disability" is defined as an individual with a disability "who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary

aids and services, meets the essential eligibility requirements for the receipt of services or the

participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2). And,

it is well established that a private party may sue to enforce Title II of the ADA. *Barnes v. Gorman*,

536 U.S. 181, 184-85 (2002); *Pandazides v. Virginia Bd. of Educ.*, 13 F.3d 823, 828 (4th Cir.

1994); *Davis v. Southeastern Community Coll.*, 574 F.2d 1158, 1159 (4th Cir. 1978), *rev'd on

other grounds*, 442 U.S. 397 (1979).

To establish a violation of Title II of the ADA, a plaintiff must show that: (1) he has a

disability; (2) he was either excluded from participation in or denied the benefits of a public entity's

services, programs, or activities for which he was otherwise qualified; and (3) the exclusion, denial

of benefits, or discrimination was by reason of the disability. *See Nat'l Fed'n of the Blind v.

Lamone*, 813 F.3d 494, 502-03 (4th Cir. 2016); *see also Helping Hand, LLC v. Baltimore County,

MD*, 515 F.3d 356, 362 (4th Cir. 2008); *Constantine v. Rectors & Visitors of George Mason Univ.*,

411 F.3d 474, 499 (4th Cir. 2005).

"Discrimination" barred by Title II includes "a failure to make reasonable modifications"

that are "necessary" to provide a disabled individual with "full and equal enjoyment" of the

facility's services. *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 461 (4th Cir. 2012).

The term "reasonable accommodations," which is derived from the employment discrimination

provisions of Title I of the ADA, is essentially synonymous with the term "reasonable

modifications to rules, policies, or practices, the removal of architectural, communication, or

transportation barriers, or the provision of auxiliary aids and services," 42 U.S.C. § 12131(2),

which is what Title II of the ADA requires a public entity to provide. *See, e.g., Robertson v. Las

Animas County Sheriff's Dept.*, 500 F.3d 1185, 1195 n.8 (10th Cir. 2007) ("Title II's use of the

term 'reasonable modifications' is essentially equivalent to Title I's use of the term 'reasonable

accommodation.'"); *McGary v. City of Portland*, 386 F.3d 1259, 1266 n.3 (9th Cir. 2004) ("Although Title II of the ADA uses the term 'reasonable modification,' rather than 'reasonable accommodation,' these terms create identical standards.").

A reasonable modification does not require the public entity to employ any and all means to make services available to persons with disabilities. *Constantine*, 411 F.3d at 488-89. Rather, the public entity is obligated to make those modifications that do not "fundamentally alter the nature of the service or activity of the public entity or impose an undue burden." *Bircoll v. Miami-Dade*, 480 F.3d 1072, 1082 (11th Cir. 2007); *see also Lamone*, 813 F.3d at 507-08 ("A modification is reasonable if it is 'reasonable on its face' or used 'ordinarily or in the run of cases' and will not cause 'undue hardship.'" (quoting *Halpern*, 669 F.3d at 464); *Pashby v. Delia*, 709 F.3d 307, 323 (4th Cir. 2013).

The Rehabilitation Act was enacted seventeen years prior to the ADA. The Rehabilitation Act provides: "No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a).

Section 504 of the Rehabilitation Act is closely related to Title II of the ADA and, to "the extent possible, [courts] construe similar provisions in the two statutes consistently." *Freilich v. Upper Chesapeake Health, Inc.*, 313 F.3d 205, 214 (4th Cir. 2002); *see Seremeth*, 673 F.3d at 336 n.1 ("Claims under the ADA's Title II and the Rehabilitation Act can be combined for analytical purposes because the analysis is 'substantially the same.'") (citation omitted); *Rogers v. Dept. of Health & Environmental Control*, 174 F.3d 431, 433-34 (4th Cir. 1999) (stating that courts may apply Rehabilitation Act precedent in interpreting the ADA, and vice versa). Indeed, the statutes

"share the same definitions of disability," *id.* at 433, and Title II of the ADA explicitly provides that "[t]he remedies, procedures, and rights" provided under § 504 of the Rehabilitation Act "shall be the remedies, procedures, and rights [that Title II of the ADA] provides to any person alleging discrimination on the basis of disability. . . ." 42 U.S.C. § 12133.[10]

Despite the general congruence of Title II of the ADA and § 504 of the Rehabilitation Act, there are two principal differences between the statutes. First, a plaintiff must show a different "causative link between discrimination and adverse action" under the two statutes. *Rose*, 192 F.3d at 469. Under Title II, a plaintiff need only prove discrimination "by reason of" disability. 42 U.S.C. § 12132. But, a successful Rehabilitation Act claim requires a showing of discrimination "*solely* by reason of" disability. 29 U.S.C. § 794(a) (emphasis added). *See Constantine*, 411 F.3d at 498 n.17 ("[W]e have recognized that the causation standards under Title II of the ADA and § 504 of the Rehabilitation Act are 'significantly dissimilar.'") (quoting *Baird*, 192 F.3d at 469).

The second significant difference between Title II and the Rehabilitation Act is that, as noted, Title II applies to any "public entity," while § 504 of the Rehabilitation Act applies only to federal agencies or to "any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). Thus, to show a violation of the Rehabilitation Act by a state, local, or private entity, a

---

[10] In turn, the Rehabilitation Act incorporates by reference the "remedies, procedures, and rights" established by Title VI of the Civil Rights Act of 1964 (codified at 42 U.S.C. § 2000d *et seq.*), which prohibits discrimination on the basis of race, color, or national origin by recipients of federal financial assistance. 29 U.S.C. § 794a(a)(2). Accordingly, courts look to Title VI precedent to resolve remedial and procedural issues arising in Rehabilitation Act and ADA Title II cases.

In general, a successful plaintiff in a suit under Title II of the ADA or § 504 of the Rehabilitation Act is entitled to a "full panoply" of legal and equitable remedies, including money damages and injunctive relief. *Pandazides*, 13 F.3d at 830; *see generally id.* at 829-32. However, there are some limitations as to available relief. Punitive damages are not available. *See Barnes*, 536 U.S. at 189. Moreover, compensatory damages are available only upon proof of disparate treatment, rather than mere disparate impact. *Pandazides*, 13 F.3d at 829-30 & n.9.

plaintiff must demonstrate that the "program or activity" at issue receives "Federal financial assistance."

As noted, Title II of the ADA prohibits discrimination by a "public entity[.]" 42 U.S.C. § 12132. The ADA defines "public entity" as "any State or local government" or "any department, agency, special purpose district, or other instrumentality of a State or States or local government[.]" 42 U.S.C. § 12131(1)(A)-(B). "By its plain language, this definition does not include private individuals or private entities." *Wright v. Carroll Cty. Bd. of Educ.*, No. ELH-11-3103, 2013 WL 4525309, at *19 (D. Md. Aug. 16, 2013) (internal quotation marks and citations omitted); *see Jones v. Sternheimer*, 387 F. App'x 366, 368 (4th Cir. 2010) (per curiam) ("[T]he ADA . . . do[es] not provide for causes of action against defendants in their individual capacities.").

Because the ADA and the Rehabilitation Act apply solely to public entities, Mills' claims under these statutes cannot proceed against the individual Defendants. *Baird*, 192 F.3d at 471 (upholding the dismissal of ADA claims against individuals because Title II recognizes a cause of action only against public entities, not private individuals); *Jennings v. Frostburg State Univ.*, ELH-21-656, 2021 WL 5989211, at *10 (D. Md. Dec.16, 2021) (dismissing individual defendants sued under the Rehabilitation Act after determining that individual liability is prohibited); *see also Vinson v. Thomas*, 288 F.3d 1145, 1156 (9th Cir. 2002) (joining the Fifth, Eighth, and Eleventh Circuits in holding that "a plaintiff cannot bring an action under 42 U.S.C. § 1983 against a State official in her individual capacity to vindicate rights created by Title II of the ADA or section 504 of the Rehabilitation Act"); *Dorsey v. Hogan*, Civil Action No. TDC-21-0721, 2022 WL 4467247 at *6-7 (D. Md. Sept. 26, 2022) (Slip Copy) (holding RA does not apply to Corizon, a private contractor, or its individual employees). Thus, Mills' claims asserted against the individual Defendants under the ADA/RA must be dismissed.

Even if Mills' complaint had survived against proper parties his ADA/RA claim would fail.  While there is no dispute that Mills suffers from mental illness, he has failed to explain how his rights were violated by Defendants who attempted to move him to a double cell to effectuate his treatment plan.  Mills was not entitled to take any action he desired under the guise of his mental health issues or use the ADA/RA as a shield to correctional and medical staff responding to his conduct *e.g.* his refusal of lawful orders to effectuate his move to a double cell. Here, Mills offers no facts to support his conclusory allegation that he was discriminated against under the ADA/RA and thus this claim is subject to dismissal for failure to state a claim.

B.  Entitlement to a Single Cell

Mills claims that as a prisoner with mental illness he is entitled to a single cell.  He is mistaken.

i.   Fourteenth Amendment-Due Process

The Fourteenth Amendment's Due Process Clause guarantees that no state shall "deprive any person of . . . liberty . . . without due process of law." A plaintiff may bring a civil action to redress due process violations under 42 U.S.C. § 1983. To establish a due process claim, a plaintiff must first show the existence of a protected property or liberty interest. *Mathews v Eldridge*, 424 U.S. 319, 332 (1976); *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972).

In the prison context, there are two different types of constitutionally protected liberty interests that may be created by government action. The first occurs when there is a state-created entitlement to an early release from incarceration. *Bd. of Pardons v. Allen*, 482 U.S. 369, 381 (1987) (state-created liberty interest in parole); *Wolff v. McDonnell*, 418 U.S. 539, 557 (1974) (state-created liberty interest in good-conduct credits). The second type of liberty interest is created by the imposition of an "atypical and significant hardship on the inmate in relation to the ordinary

incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995); *see Wilkinson v. Austin*, 545 U.S. 209, 222-24 (2005) (applying "[t]he *Sandin* standard"). As the Fourth Circuit has noted, "[t]he Supreme Court has long recognized that a prisoner may have a state-created liberty interest in certain prison confinement conditions." *Prieto v. Clarke*, 780 F.3d 245, 248 (4th Cir. 2015). Whether confinement conditions are atypical and substantially harsh "in relation to the ordinary incidents of prison life" is a "necessarily . . . fact specific" comparative exercise. *Beverati v. Smith*, 120 F.3d 500, 502-03 (4th Cir. 1997).

"[G]iven a valid conviction, the criminal defendant has been constitutionally deprived of his liberty to the extent that the State may confine him and subject him to the rules of its prison system so long as the conditions of confinement do not otherwise violate the Constitution." *Meachum v. Fano*, 427 U.S. 215, 224 (1976). But, courts generally defer to decisions made by officials relating to their administration of a prison facility. *Bell v. Wolfish,* 441 U.S.520, 547 (1979). As the Supreme Court has cautioned, "[t]he difficulties of operating a detention center must not be underestimated by the courts." *Florence v. Bd. of Chosen Freeholders of Cty. of Burlington*, 566 U.S. 318, 326 (2012).

It is well established that prisoners do not have a constitutional right to access jobs or to demand to be housed in one prison rather than another, absent a showing of significant hardship. *See Sandin*, 515 U.S. at 484; *see also Kitchen v. Upshaw*, 286 F. 3d 179, 187 (4th Cir. 2002). Moreover, double or triple celling inmates is not per se unconstitutional. *See e.g. Rhodes v. Chapman*, 452 U.S. 337, 348 (1981). Therefore, no due process liberty interest is implicated here, and Mills was not entitled to a hearing or an opportunity to be heard on the issue of his assignment to a double cell. *See Sandin,* 515 U.S. at 484.

In analyzing inmate assignments to programming, jobs and housing, the court must consider a correctional system's need to maintain order, discipline, and control. *See Sandin*, 515 U.S. at 482 (stating that "federal courts ought to afford appropriate deference and flexibility to state officials trying to manage a volatile environment"). Absent a protected liberty interest, a plaintiff cannot successfully claim that his due process rights were violated, because "[p]rocess is not an end in itself." *Olim v. Wakinekona*, 461 U.S. 238, 250 (1983).

This Court is unaware of any Maryland law or regulation conferring a protected liberty interest on DPSCS inmates that has been abridged here. As stated, Mills had no liberty interest in being assigned to a single cell. Mental health staff sought to have Mills removed from a single cell and assigned to a double cell based while he remained on the SNU based on their belief that Mills's mental health would benefit from greater social interactions. Such a determination, and the effort to effectuate Mills's treatment plan did not violate Mills's right to due process. Reviewing Mills's allegations in the light most favorable to him, there are no genuine issues of material fact and Defendants are entitled to summary judgment in their favor concerning Mills's Fourteenth Amendment claim.

ii.     Eighth Amendment-Medical Care/Failure to Protect

To the extent Mills alleges that the order to transfer him from a single cell to a double cell violated his Eighth Amendment rights because such an order was deliberately indifferent to his serious medical needs and placed him at risk of harm, his claim fails. Similarly, Mills's claim that his mental health condition worsened due to his being housed on disciplinary is also unavailing.

"The Eighth Amendment's prohibition on cruel and unusual punishments imposes certain basic duties on prison officials." *Raynor v. Pugh*, 817 F.3d 123, 127 (4th Cir. 2016) (citing *Farmer*, 511 U.S. at 832). Those duties "include maintaining humane conditions of confinement,

including the provision of adequate medical care and . . . 'reasonable measures to guarantee the safety of the inmates.'" *Raynor* 817 at 127. But, "not every injury suffered by a prisoner at the hands of another translates into constitutional liability for prison officials responsible for the victim's safety." *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015).

Under the Eighth Amendment to the United States Constitution, an inmate retains the right to be free from "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). At the summary judgment stage, the inmate must generate some evidence that a defendant's acts or omissions reflects a deliberate indifference to the inmate's serious needs. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). "Deliberate indifference is a very high standard – a showing of mere negligence will not meet it." *Grayson v. Peed*, 195 F.3d 692, 695-96 (4th Cir. 1999). "[T]he Constitution is designed to deal with deprivations of rights, not errors in judgment, even though such errors may have unfortunate consequences." *Grayson*, 195 F.3d at 695-96; *see also Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014) (describing the applicable standard as "exacting").

In the context of medical care, deliberate indifference specifically requires the inmate to show that objectively, he suffered from a serious medical need and that, subjectively, the medical provider was aware of the need and either failed to provider or secure proper care. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). A "serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko*, 535 F.3d at 241 (internal quotation marks and ellipses omitted).

Additionally, Mills must generate some evidence that Defendants exhibited "subjective recklessness" in the face of the serious medical condition. *Farmer*, 511 U.S. at 839-40. "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997). "Actual knowledge or awareness on the part of the alleged inflicter … becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844).

If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." *Farmer*, 511 U.S. at 844. Reasonableness of the actions taken must be judged considering the risk known to the defendant at the time. *Brown v. Harris*, 240 F.3d 383, 390 (4th Cir. 2000); *see also Jackson*, 775 F.3d at 179. That said, "negligence or malpractice on the part of … doctors in missing [a] diagnosis does not, by itself, support an inference of deliberate indifference." *Johnson v. Quinones*, 145 F.3d 164, 166 (4th Cir. 1998). Adequacy of treatment in this context "is one of medical necessity and not simply that which may be considered merely desirable." *Bowring v. Godwin*, 551 F.2d 44, 47-48 (4th Cir. 1977). A mere disagreement between inmate and a physician over the appropriate level of care does not establish an Eighth Amendment violation absent exceptional circumstances. *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016); *see also Hendrick v. Wexford Health Sources, Inc.*, 141 F. Supp. 3d 393 (D. Md. 2015) (holding medical providers did not act with deliberate indifference to a serious medical need of a prisoner by returning him to double cell instead of single cell as he requested: medical provider believed having a cellmate was beneficial to Plaintiff and there was no indication prior placement of prisoner in single cell was an

absolute medical necessity: prisoner's subjective concerns for his safety were not sufficient to show excessive risk to his health and safety); *Williams v. Bishop,* No. RWT–12–1616, 2014 WL 4662427, at *6 (D. Md. Sept. 17, 2014) ("A prisoner's strong desire to be in a single cell, based on his belief that his medical conditions cause difficulties with cellmates, does not entitle him to housing in a single cell unless medical providers unless have made a directive for a single cell based on a medical need.").

Similarly, in order to prevail on a claim of failure to protect from harm, Mills must establish that Defendants exhibited deliberate or callous indifference to a specific known risk of harm. *See Pressly v. Hutto*, 816 F.2d 977, 979 (4th Cir. 1987). However, a prison official cannot be found liable under the Eighth Amendment "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837; *see also Rich v. Bruce*, 129 F.3d 336, 339-40 (4th Cir. 1997). A two-part inquiry that includes both an objective and a subjective component must be satisfied to establish liability. *See Raynor*, 817 F.3d at 127.

Objectively, a plaintiff "must establish a serious deprivation of his rights in the form of a serious or significant physical or emotional injury" or substantial risk of either injury. *Danser v. Stansberry*, 772 F.3d 340, 346-47 (4th Cir. 2014). The objective inquiry requires the court to "assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk." *Helling v. McKinney*, 509 U.S. 25, 36 (1993).

Subjectively, a plaintiff must establish that the prison official had "a sufficiently culpable state of mind" amounting to "deliberate indifference to inmate health or safety." *Farmer*, 511 U.S.

at 834.  Evidence establishing a culpable state of mind requires actual knowledge of an excessive risk to the prisoner's safety or proof that the prison official was aware of facts from which an inference could be drawn that a substantial risk of serious harm existed and that the inference was drawn.  *Id*. at 837.  A plaintiff may "prove an official's actual knowledge of a substantial risk 'in the usual ways including inference from circumstantial evidence" so that "'a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.'"  *Raynor*, 817 F.3d at 128.  Actual knowledge of a substantial risk does not alone establish liability.  Where prison officials responded reasonably to a risk, they may be found free of liability.  *Farmer*, 511 U.S. at 844.

Defendants do not dispute that Mills's mental health issues are serious.  Nevertheless, the record construed most favorably to Mills does not support a finding of deliberate indifference to that medical need or a failure to protect Mills from a known risk of harm by assigning him to a double cell or placing him on disciplinary segregation. Rather, the record makes clear that the decision to assign Mills to a double cell was made by Mills's mental health care team who believed that such a move would benefit his illness. Mills's disagreement with that determination is insufficient to demonstrate that any of the named Defendants were deliberately indifferent to his medical needs or to a known risk of harm by directing he be placed in a double cell. Moreover, the correctional defendants were entitled to rely on the medical directions of Mills's mental health care team.

Mills's mental health records show that he was non-compliant with medication, refused to attend scheduled mental health appointments, was belligerent with staff, and refused to cooperate with his treatment plan. Mills's own conduct resulted in his avoidance of double celling, as such,

there is simply no evidence that Mills suffered any ill effect form being double celled because he never permitted a trial of double celling for anyone to determine its therapeutic efficacy.

As to Mills's claim that his mental health worsened during his confinement to disciplinary segregation, there is simply no evidence before the Court to support that assertion. First, Mills has not explained how the conditions of his confinement to disciplinary segregation differed from his single cell assignment on the SNU such that he encountered a worsening of his symptoms. Further, the record evidence demonstrates that during Mills's confinement to disciplinary segregation he voluntarily stopped taking his psychiatric medications and his mental health illness did not in fact worsen but rather improved resulting in the removal of the diagnosis of a severe mental illness from his record.  Mills has not come forward with any evidence to create a material dispute of fact on his Eighth Amendment claims related to his housing assignment. As such Defendants are entitled to summary judgment.

C.   Retaliation

To state a claim of retaliation for exercising a First Amendment right, a plaintiff must allege that: (1) the plaintiff engaged in protected First Amendment activity; (2) the defendant took some action that adversely affected the First Amendment rights; and (3) there was a causal relationship between the protected activity and the defendant's conduct. *See Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005); *cf. Laurent-Workman v. Wormuth*, 54 F.4th 201, 212 (4th Cir. 2022) (outlining elements of a Title VII retaliation claim) .

A plaintiff can establish retaliatory conduct if the defendant took an action against the plaintiff that "would likely deter 'a person of ordinary firmness' from the exercise of First Amendment rights." *Martin v. Duffy*, 858 F.3d 239, 249 (4th Cir. 2017) (quotation marks and citation omitted). A plaintiff must also demonstrate a causal connection between his First

Amendment activity and the alleged retaliatory action. *See Constantine*, 411 F.3d at 501. The showing can be based on circumstantial evidence, such as evidence that the defendant was aware of the First Amendment activity, and that the retaliatory act was temporally proximate to that activity. *Id*.

In the prison context, courts "treat [claims of retaliation] with skepticism because 'every act of discipline by prison officials is by definition 'retaliatory' in the sense that it responds directly to prisoner misconduct.'" *Cochran v. Morris*, 73 F.3d 1310, 1317 (4th Cir. 1996) (citing *Adams v. Rice*, 40 F.3d 72, 74 (4th Cir. 1994)). As such, an inmate cannot simply assert a generalized retaliatory animus but must allege facts that support the claim of retaliation. *White v. White*, 886 F. 2d 721, 724 (4th Cir. 1989). Moreover, a retaliation claim fails if there is a legitimate reason for the alleged retaliatory action. *Mt. Healthy City Sch. Dist. Bd. Of Educ. v. Doyle*, 429 U.S. 274, 287 (1977).

Here, Mills' retaliation claim is directed toward Beitzel and Guthrie, and other unnamed members of his mental health care team who were responsible for entering the Order that he be placed in a double cell. He alleges that the Order to rescind his single cell status was based off of complaints he made while housed on the SNU. Mills does not specify what complaints he made as an SNU inmate or when those complaints were made. There is simply not linking by Mills of the alleged protected First Amendment activity and the change in Mills's housing status. Mills's assertions that the directive he be double celled was retaliatory in nature is an impermissible effort to bolster a meritless complaint by adding allegations of retaliation. *See Brown v. Carpenter*, 889 F. Supp. 1028, 1034 (W.D. Tenn. 1995) ("A plaintiff cannot bootstrap a frivolous complaint with conclusory allegations of retaliation.").

Moreover, Beitzel is entitled to summary judgment as to Mills's retaliation claim. There is simply no evidence that Beitzel entered the order rescinding Mills's single cell status in retaliation for unspecified complaints filed by Mills. Beitzel specifically avers that she did not retaliate against Mills and is not aware of any other employee doing so. She explains that the decision to change Mills's housing status was based on the decision of Mills's treatment team and in an effort to move forward his mental health treatment. Mill has put forth no evidence to rebut Beitzel's assertions or to demonstrate that she, or any other member of Mills's health care team, retaliated against him in any way for filing complaints. Instead, the record evidence demonstrates that Defendants believed initially that Mills would benefit from being housed in a double cell on SNU and ultimately that he should be removed from SNU because he declined to take part in the therapeutic activities, was belligerent to staff, and threatening to other inmates. Defendants are entitled to summary judgment.

D. Personal Participation

It is well settled that liability under § 1983 attaches only upon personal participation by a defendant in the constitutional violation. *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001).

Mills alleges that Defendants Hill, Taylor, Green, Holmes and Hogan "dismissed [Mills's] grievance." Mills I, ECF No. 1 at 37. While former Governor Hogan did not review inmate grievance, Mills's claim nevertheless fails as the mere review of inmate grievances is insufficient to state a claim. In short, a denial of a grievance does not alone give rise to liability. *See Gallagher v. Shelton*, 587 F.3d 1063, 1069 (10th Cir. 2009) (allegation that warden "rubber stamped" grievances was not enough to establish personal participation) (citing *Whitington v. Ortiz*, 307 Fed. App'x 179, 193 (10th Cir. 2009) (unpublished) ("denial of the grievances alone is insufficient to establish personal participation in the alleged constitutional violations.")

Mills generally alleges that Defendants Whiteman, Nines and Bishop were responsible for putting him on disciplinary segregation when he refused housing in June of 2019. Mills I, ECF No. 1 at 22. As noted these claims regarding his assignment to disciplinary segregation and the disciplinary proceedings were previously litigated in Civil Action No. TDC-22-1640 and will not be reconsidered here.

To the extent Mills seeks to hold Defendants Hill, Taylor, Green, Holmes, Hogan, Whiteman, Nines, and Bishop liable because of their supervisory roles, those claims cannot proceed. The doctrine of respondeat superior does not apply in § 1983 claims. *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (no respondeat superior liability under § 1983).[11] Liability of supervisory officials "is not based on ordinary principles of respondeat superior, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)).

Ultimately, to establish supervisory liability under § 1983, the plaintiff must show that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury

---

[11] Respondeat superior is a legal doctrine that provides an employer is liable in certain instances for the wrongful acts of an employee. *See Black's Law Dictionary* (8th ed. 2004).

suffered by the plaintiff. *See Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994). At this juncture, the plaintiff must allege facts that, if proven, would establish such liability.

Where, as here, a plaintiff points to no action or inaction on the part of supervisory defendants that resulted in a constitutional injury, the claims against supervisory personnel must be dismissed. As such, Defendants Hill, Taylor, Green, Holmes, Hogan, Whiteman, Nines, and Bishop are entitled to dismissal.

Lastly, as to the supervisory Defendants, Mills alleges that Defendants Hill, Todd., Holmes, Green, and Hogan created a policy or custom of "systematic deficiencies in staffing and procedures which make unnecessary suffering inevitable for mental health care supports. . . ." Mills I, ECF No. 1 at 42. He also alleges that "the policy of double celling special needs unit and severely mentally ill inmates is that this is a dangerous policy that results in anguish and injury to severe injury to death of prison officials and/or inmates. . . ." Mills I, ECF No. 5 at 5.

A claim for an alleged violation of constitutional rights may be premised on an allegation that a policy or practice has caused the injury alleged. S*ee Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658, 691-92 (1978); *see also Simons v. Montgomery Cnty. Police Officers*, 762 F.2d 30, 33 (4th Cir. 1985). To sustain such a claim, however, a plaintiff must establish (1) the existence of a constitutional violation, *see Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (holding that jury's finding that a police officer inflicted no constitutional injury on the plaintiff removed any basis for municipal liability against city and members of police commission), and (2) any constitutional violations were proximately caused by a policy, custom, or practice of the defendants, *see Monell*, 436 U.S. at 691.

Mills asserts that there is a policy that results in mentally ill inmates being double celled but he fails to identify the policy other than the simple fact that inmates with mental illness are

subjected to the same housing policies as other inmates, absent a directive from their mental health provider. More importantly, Mills's claim fails as he has failed to establish a constitutional violation.

E.  Eleventh Amendment Immunity

Mills raises constitutional claims against state employees as well as against state agencies the Maryland Department of Public Safety and Correctional Services Division of Correction, the North Branch Correctional Institution, and the Inmate Grievance Office. Under the Eleventh Amendment of the United States Constitution, a state, its agencies, and its departments are immune from citizen suits in federal court absent state consent or Congressional action. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). Claims against state employees acting in their official capacities are also subject to Eleventh Amendment immunity because a suit against the state actor is tantamount to a suit against the state itself. *See Brandon v. Holt*, 469 U.S. 464, 471–72 (1985). The State of Maryland has not waived such immunity for claims of constitutional violation brought under § 1983. *See Pevia v. Hogan*, 443 F.Supp.3d 612, 632 (D. Md. 2020). Accordingly, Mills's constitutional claims against the individually named Defendants in their official capacities as well as his constitutional claims asserted against the Maryland Department of Public Safety and Correctional Services Division of Correction, the North Branch Correctional Institution, and the Inmate Grievance Office are dismissed. In contrast, the Eleventh Amendment does not bar Mills's request for prospective injunctive relief.

F.  Injunctive Relief

Mills also seeks injunctive relief.  A party seeking a preliminary injunction or temporary restraining order must establish the following elements: (1) a likelihood of success on the merits; (2) a likelihood of suffering irreparable harm in the absence of preliminary relief; (3) that the

balance of equities tips in the party's favor; and (4) why the injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Failure to establish one of these elements is fatal to the request for injunctive relief.

For the reasons discussed above, Mills has failed to demonstrate the likelihood of success on the merits. Therefore, his request for injunctive relief must be denied.

### IV. Conclusion

For the foregoing reasons, Defendants' motions to dismiss, or in the alternative for summary judgment shall be granted.[12]

A separate Order follows.

Jan 12, 2024
Date

LYDIA KAY GRIGGSBY
United States District Judge

---

[12] Having found no constitutional violation, the Court need not address the Defendants' additional defenses.